THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELYRIA ALCALA, Defendant-Appellant.

First District (1st Division)   No. 1—90—3198

Opinion filed June 7, 1993.—Rehearing denied August 2, 1993.

412

Michael J. Pelletier and Todd Avery Shanker, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Following a jury trial, defendant, Elyria Alcala, was convicted of delivery of a controlled substance (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)(C)) and was sentenced to a 13-year prison term.

We affirm.

Defendant's conviction was obtained with the aid of Octavio Villegas, who had agreed to cooperate with the Cook County State's Attorney's office of narcotics investigation following his own arrest for drug possession. The conviction arose from a transaction to sell cocaine in which Michael Trejo, a Cook County State's Attorney investigator, posed as purchaser.

Villegas testified that he met defendant in a bar at 93rd Street and Commercial Avenue. He had seen defendant before because she worked at the bar as a bartender. On April 22, 1989, Villegas approached defendant at the bar and told her that he "knew some one who would buy." Defendant replied that she "had some" and "to bring" the person who would buy. No specific amount of drugs was discussed. The next day, Villegas called defendant and then contacted police regarding the sale.

At 1:30 p.m., Villegas and Trejo arrived at defendant's home, located at 9825 South Exchange Avenue, in Chicago. Villegas entered the home first and then signaled for Trejo to come in. Villegas introduced defendant and Trejo. Defendant and Trejo then went into another room, where Villegas could not hear what was being said.

Trejo testified that he arrived at defendant's home with Villegas. Villegas entered the home first while Trejo waited by the car.

After a couple of minutes, Villegas motioned for Trejo to come in. Villegas introduced Trejo to a woman, identified as defendant, sitting on a couch. Another woman sat on the couch, but Trejo was not introduced to her. Defendant stood up, shook hands with Trejo, and instructed him to follow her to another room.

Trejo followed defendant to what appeared to be a woman's bedroom. Defendant sat on the bed and asked Trejo how much "coca" he wanted. Trejo explained that the term "coca" was Spanish slang for cocaine. Trejo responded that he wanted "a half a key." Again, Trejo explained that the term was slang for one half of one kilo of cocaine. Defendant then reached into a drawer and pulled out a "little brown cassette box." The box contained a clear, plastic "baggie" which defendant handed to Trejo. Trejo asked if the bag contained "a half a key," and defendant assured him that it did, but that if he was "shorted," he was to return, and she would make up the difference. Trejo continued to examine the substance in the bag which he stated was "kind of rocky." Defendant told him that the "stuff" came from Waukegan and not from "the neighborhood." Trejo then asked her how much the drug would cost to which defendant replied $16,500. Trejo told her the price was too high and offered only $16,000. Defendant turned this counteroffer down, indicating that she had to "make a profit." Trejo then agreed to the price and asked her to come outside to his car for the money. Defendant refused and told Trejo that she would wait there. Trejo asked her again to come out to his car, and again, defendant refused. Trejo ultimately capitulated to defendant's request.

Trejo went out to his car and opened his trunk, which indicated to Trejo's backup surveillance units that the deal was "going down." Trejo reentered the home and, with defendant, exchanged the money for the drugs. At that point, the backup units entered the residence and arrested them.

Chicago police officer Robert Navigato was part of the surveillance team assigned to monitor Trejo's drug purchase. Navigato watched Trejo and Villegas arrive together at the residence and later enter the home separately. When Navigato saw Trejo open the trunk of the car, he and his fellow surveillants entered the home. As he entered the home, he saw a young Hispanic woman seated on the couch in the living room with Villegas. He then saw Trejo exiting from a bedroom followed by defendant, who was inside the bedroom doorway. Navigato arrested defendant and read her the *Miranda* warnings from his police handbook.

Navigato described the bedroom from which defendant and Trejo emerged as a female's room because perfumes, jewelry, and powders were displayed on the dresser. When Navigato told defendant that she was under arrest for selling drugs, she denied that she had done anything wrong and that she had any knowledge of drugs. Defendant agreed to sign a consent to search form, which was read into evidence. After she signed the form, Navigato informed her that she had just sold drugs to an undercover police officer. Defendant then began to cry and stated that she was "sorry" that she ever "got involved." Navigato then asked her if there were any more drugs in the house. Defendant pointed to the nightstand in the room, in which Navigato subsequently found two more packets of cocaine.

Defendant was then taken to the kitchen and interviewed by a State's Attorney investigator. Defendant admitted to the sale and stated that she had obtained the cocaine from her ex-husband, Jose Romero.

Navigato then resumed his search of the residence and discovered two "Ohaus" scales in a closet in defendant's bedroom. Navigato explained that these scales were "triple beam," very accurate, and inevitably found at drug raids because of their popularity with drug dealers. Navigato also found $900 in United States currency on the dresser in defendant's bedroom. In defendant's nightstand, Navigato discovered "snow seals," papers used to package cocaine in quantities of one gram or less.

Defendant was taken to the police station at 35th Street and Normal Avenue, where she signed a *Miranda* release form. During her interview, defendant admitted that her "end" of the transaction was to be $500 and a ticket to Hawaii to visit her daughter.

The State also presented the testimony of two other officers assigned to provide backup to Trejo. Investigator William P. Walsh of the Cook County State's Attorney office entered defendant's residence after she had been placed under arrest. Walsh observed officers discovering the scales in the bedroom. Walsh also observed defendant being interviewed at the kitchen table. Defendant told her interrogators that she was "going to have to pay the price" for her actions. At that time, two of defendant's grandchildren came into the house. Defendant stated that she did not want to be led away in handcuffs in front of the children. Walsh agreed to the request and did not use handcuffs until defendant was placed into the squad car. As defendant exited her home, she told her grandchildren to "learn a lesson from this," "not to do what" she "had

done" and that she "was sorry." Defendant then turned to the other woman in the apartment, who was "crying," "screaming" and "carrying on" and told her to "shut up," "quit crying," and to "take care of the kids." Defendant told Walsh that the woman was not involved in the transaction.

Chicago police officer Raymond Golnick also testified to the events which occurred during the raid. Villegas was Golnick's informer. Although the raiding team was not aware of the exact amount of drugs to be purchased, they were aware that they were "going" for "at least a half a kilo." Golnick was present when defendant signed the consent to search form in her bedroom. Golnick observed Navigato discover the packets of cocaine in defendant's nightstand. He also was present when the scales and cocaine packaging papers were found.

Golnick interviewed defendant at the police station. There, defendant told him that the drugs had been given to her by her ex-husband, Jose Romero. She did not mention either "Armando" or "Lupe." Defendant stated that she was to receive $500 and a plane ticket to Hawaii for her participation in the purchase.

The parties stipulated that if called to testify, Art Kruske, a Chicago police chemist, would state that he had analyzed the white substance purchased by Trejo from defendant, utilizing the proper and correct testing procedures. In Kruske's expert opinion, the bag contained 495.1 grams of cocaine. The two packets discovered in the nightstand contained 59.82 grams of cocaine. The cocaine was found to 87.4% pure.

Defendant asserted an entrapment defense and sought to establish that she had been induced to participate in the transaction by both Villegas and a young woman named Lupe. Defendant resided at her home with her three grandchildren, Lupe, and Lupe's boyfriend, Armando. Defendant had met Lupe a year prior to her arrest. Lupe had recently undergone surgery and asked defendant if she could stay with her at her house.

It was defendant's testimony that on April 19, 1989, she discovered Lupe in tears because one of Lupe's children was "going blind" and Lupe needed money for the surgery. Lupe explained that Armando and Villegas "had a buyer" for drugs. When defendant asked what that had to do with her, Lupe responded that they needed defendant to act as an interpreter. Defendant refused to help. Defendant stated that she had never been involved with drugs and "couldn't handle this."

Over the next few days, Lupe continued to cry and ask defendant for her assistance. Again, defendant refused to help. On April 22, Lupe and defendant went out to eat dinner. At the restaurant, Villegas came over to their table and Lupe informed him that she "would meet [him] later." Villegas then left. Lupe and defendant then went to the LaPlaya Lounge on 93rd Street. The bar was owned by defendant's nephew, and defendant was "helping out" by taking care of it while he was out of town. Villegas entered the bar, and he and Lupe went into a rear stockroom. Defendant followed them and was introduced to Villegas by Lupe as the man "that has the buyer." Defendant told them that she did not wish to be involved. Villegas told her that "nothing will happen" if she let him use her house and she acted as an interpreter. Villegas also told her there was no reason to be afraid and promised her $500 and a plane ticket to Hawaii. Defendant explained that her daughter was to undergo surgery in Hawaii and that she could not afford the airfare. Defendant also admitted she was concerned about being arrested and was aware that what she was to do was wrong.

According to defendant, Villegas called defendant's home the next day and asked for Lupe. After 11 a.m., Armando came to the house with the drugs, which were contained in a "Crown Royal" satchel. The drugs were left on the kitchen table. Lupe then called Villegas, and he later arrived at the home with Trejo. When Trejo entered the house, Villegas instructed defendant to bring the "merchandise" from the kitchen to the bedroom. There, Trejo opened the satchel and asked defendant for a scale. Trejo then offered her $16,000 for the drugs. Defendant told him that "they" had said $16,500. Trejo agreed to the price and subsequently left the house to retrieve the money. When he reentered with the money, he placed her under arrest.

Defendant denied ever seeing the two packets of drugs, the scales, and the other paraphernalia which had been found in her bedroom and had no idea how those items came to be discovered in her home. Defendant stated that the $900 found on her dresser represented the "receipts" from her nephew's bar. Defendant denied telling police that Jose Romero had delivered her the drugs. Defendant stated that she was not a drug dealer and only became involved because she "felt sorry for a person because I have children of my own, and I put myself in her place." Defendant also denied that police ever gave her *Miranda* warnings. Defendant admitted signing the consent to search form.

On appeal, defendant argues that the State failed to prove her guilt beyond a reasonable doubt, in view of the evidence of entrapment. The State responds that defendant has waived this claim because she did not raise it in her post-trial motion for a new trial. We disagree.

■ Our review of the post-trial motion reveals that defendant included in it the argument that the State failed to prove her guilty beyond a reasonable doubt. This sufficiently preserved the issue for appeal.

Section 7—12 of the Criminal Code of 1961 provides that a defendant cannot be found guilty of an offense where the conduct forming the basis for the offense was incited or induced by a public officer or agent for purposes of obtaining evidence to prosecute. (Ill. Rev. Stat. 1989, ch. 38, par. 7—12.) This affirmative defense is inapplicable, however, where defendant merely is provided with the opportunity or the facility for committing the offense in furtherance of a criminal purpose originating with the defendant. (Ill. Rev. Stat. 1989, ch. 38, par. 7—12.) Accordingly, defendant's predisposition to commit crime is the critical inquiry. (*People v. Gannon* (1991), 213 Ill. App. 3d 560, 565, 572 N.E.2d 1133; *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812, *cert. denied sub nom. Thomas v. Illinois* (1980), 445 U.S. 929, 63 L. Ed. 2d 762, 100 S. Ct. 1316.) Generally, predisposition is established by a defendant's willingness to participate in criminal activity before his initial exposure to government agents. (*People v. Poulos* (1990), 196 Ill. App. 3d 653, 661, 554 N.E.2d 448.) Factors to be considered in assessing predisposition include the defendant's initial reluctance or her ready willingness to commit the crime, the defendant's familiarity with drugs and her willingness to accommodate the needs of drug users, the defendant's willingness to make a profit from the illegal act, the defendant's prior or current drug usage, the defendant's participation in testing or cutting the drugs, and whether defendant had ready access to a drug supply. See *People v. Poulos*, 196 Ill. App. 3d at 661 (and cases cited therein).

A defendant who asserts the entrapment defense is entitled to instruct the jury on the defense, if, when viewing evidence presented in a light most favorable to the defendant, there is some evidence supporting the defense. (Ill. Rev. Stat. 1989, ch. 38, pars. 7—12, 3—2; *People v. Poulos*, 196 Ill. App. 3d 653, 554 N.E.2d 448.) In order to convict, the State must then prove defendant guilty beyond a reasonable doubt as to the defense together with all other elements of the crime. (Ill. Rev. Stat. 1989, ch. 38, par. 3—2(b).) Our

courts have recognized that the determination of defendant's predisposition to commit crime is fact dependent and, as such, is an issue to be decided by the trier of fact. *People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528; *People v. Gannon*, 213 Ill. App. 3d at 565.

Upon review, that determination is given particular deference. (See *People v. Gannon*, 213 Ill. App. 3d at 565.) Accordingly, this court must affirm, where, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267) unless entrapment can be found as a matter of law. (See *People v. Tipton*, 78 Ill. 2d at 487; see also *People v. Poulos*, 196 Ill. App. 3d 653, 554 N.E.2d 448.) Entrapment as a matter of law is not established where there is any substantial evidence from which it may be inferred that the criminal intent to commit a particular offense originated in the mind of the accused. *People v. D'Angelo* (1992), 223 Ill. App. 3d 754, 585 N.E.2d 1239, *appeal denied* (1992), 145 Ill. 2d 638, 596 N.E.2d 632.

■ Initially, we note that defendant's sufficiency of the evidence argument can succeed only if her trial testimony is taken as true. That testimony, however, conflicted with that presented by the State's witnesses. Where, as here, entrapment is involved, a reviewing court is precluded from substituting its judgment for that of the jury with regard to the weight of the evidence or the credibility of witnesses. (*People v. Lambrecht* (1992), 231 Ill. App. 3d 426, 595 N.E.2d 1358, *appeal denied* (1992), 146 Ill. 2d 641, 602 N.E.2d 465.) That is so because it is the trier of fact's responsibility to weigh the credibility of the witnesses and to resolve the conflicts and inconsistencies. (*People v. Aguilar* (1991), 218 Ill. App. 3d 1, 578 N.E.2d 109, *appeal denied* (1991), 142 Ill. 2d 656, 584 N.E.2d 131.) Here, the jury heard both Villegas' and defendant's versions of the events giving rise to the transaction and apparently resolved the discrepancies against defendant. Moreover, defendant's version of what occurred in the house with Trejo during the actual sale was markedly different from Trejo's testimony. Again, these conflicts and inconsistencies were resolved against defendant.

■ Keeping the foregoing principles in mind and viewing the testimony presented in a light most favorable to the State, defendant's conviction must be affirmed. Villegas testified that he told defendant that he "knew someone who would buy." Defendant did

not refuse this offer, but told Villegas "to bring" him around. This court must accept Villegas' testimony as true as all the evidence must be viewed in the light most favorable to the State. (See *People v. D'Angelo*, 223 Ill. App. 3d at 777.) The transaction was set for the next day. This evidence established defendant's "ready willingness" to commit the crime and her "ready access" to a drug supply. Trejo testified that when he was examining the cocaine, defendant told him "the stuff" came from Waukegan and was not from the neighborhood, apparently to indicate the high quality of the cocaine. She also assured Trejo to return if he found that he was "shorted." This evidence tends to establish defendant's "familiarity" with drugs and her willingness to "accommodate the needs" of drug users. Trejo's testimony further established that defendant was familiar with the slang used in the drug trade. Additionally, defendant's refusal of Trejo's lower price offer indicates her eagerness to make a profit. Indeed, defendant's own testimony established that she was willing to make a profit from what she knew to be an illegal act. This evidence, taken as a whole, is sufficient to establish defendant's predisposition to commit the crime. Defendant, however, points to her reluctance to get involved in the transaction as evidence of her lack of predisposition. Again, the only evidence of such reluctance was provided by defendant's own testimony. A close reading of her testimony, however, reveals that this reluctance can be interpreted as a demonstration of the "natural hesitancy and caution of one acquainted with and engaged in illegal activity." (See *People v. D'Angelo*, 223 Ill. App. 3d at 779.) The evidence, when taken as a whole, sufficiently supports the jury's rejection of defendant's entrapment defense and its finding of guilt.

During its deliberations, the jury sent a note to the judge which contained the following inquiry:

"Was Octavio [Villegas] considered an agent of any of the following: the Chicago Police Department, State's Attorney's Office, DEA, other prosecuting body in this trial."

Defense counsel sought to have the question answered "directly" that "yes, he is an agent." The State asked that the jury be told that it has the evidence, the exhibits, and the instructions and to resume its deliberations. The circuit court agreed, and the jury was instructed in that manner. Defendant now argues that the court committed error by failing to answer the inquiry in the affirmative.

Generally, jurors are entitled to have their questions answered. (*People v. Reid* (1990), 136 Ill. 2d 27, 39, 554 N.E.2d 174; *People v. Clark* (1972), 52 Ill. 2d 374, 391, 288 N.E.2d 363.) The circuit court

has a duty to instruct the jury where clarification is requested, the original instructions are incomplete, and the jurors are manifestly confused. (*People v. Reid*, 136 Ill. 2d at 39.) Moreover, the circuit court is obliged to answer a jury's questions even if the jury has received proper instructions. *People v. Reid*, 136 Ill. 2d at 39.

Nevertheless, our supreme court has indicated that, under the appropriate circumstances, a circuit court may, in the exercise of its discretion, refrain from answering a jury's questions. (*People v. Reid*, 136 Ill. 2d at 39.) Such a course of action is acceptable if the jury instructions are readily understandable and sufficiently explain the relevant law (*People v. Palmer* (1982), 111 Ill. App. 3d 800, 444 N.E.2d. 678) and further instructions would serve no useful purpose (*People v. Jones* (1976), 40 Ill. App. 3d 771, 353 N.E.2d 79) or would potentially mislead the jury (*People v. Dunigan* (1981), 96 Ill. App. 3d 799, 421 N.E.2d 1319) or if the inquiry involves a question of fact. (*People v. Hooker* (1977), 54 Ill. App. 3d 53, 369 N.E.2d 147.) A circuit court also may properly refuse to answer a jury inquiry if an answer or explanation by the court would cause the court to express an opinion which would probably direct a verdict one way or the other. (*People v. Reid*, 136 Ill. 2d at 39.) Furthermore, if the inquiry may require " 'a colloquy between the court and the jury, a further explanation of the facts, and perhaps an expression of the trial court's opinion on the evidence,' " then the court may decline to answer the question. *People v. Reid*, 136 Ill. 2d at 39-40, quoting *People v. Tostado* (1981), 92 Ill. App. 3d 837, 839, 416 N.E.2d 353.

The State suggests that had the trial judge answered the jury's inquiry with a direct "yes" answer, the judge would have offered an expression of his opinion as to the evaluation of the evidence. Support for this position appears in both the committee comments to the entrapment statute and *People v. Wielgos* (1991), 142 Ill. 2d 133, 568 N.E.2d 861.

■ According to the committee comments accompanying the entrapment statute, there are four elements of the defense, including "the concept of committing the offense originates with the State or its agent." (Ill. Ann. Stat., ch. 38, par. 7—12, Committee Comments, at 440 (Smith-Hurd 1989).) Our supreme court has ruled that this element "implicitly includes a finding that an agency relationship exists between the government officer and the alleged entrapping party." (*People v. Wielgos*, 142 Ill. 2d at 137.) In view of this, the jury's inquiry, whether Villegas was considered an agent, sought a factual determination that they, as jurors, were required to

make. Accordingly, the circuit court correctly refused to answer the inquiry.

Defendant next alleges that she was denied her constitutional right to confront witnesses when the circuit court disallowed defense counsel's questions regarding the extension of time given by the State's Attorney's office to Villegas with regard to his agreement.

At trial, Villegas stated that he was arrested on June 28, 1988, for possession of drugs and weapons. Seeking to avoid a lengthy prison term, Villegas entered into an agreement with authorities on December 15, 1988. This agreement called for Villegas' assistance in obtaining five indictments stemming from drug seizures of at least 60 grams. In the agreement, Villegas was given until January 31, 1989, to complete his part of the contract. On cross-examination, defense counsel asked Villegas if defendant's arrest was the "one that gets you off the hook," to which Villegas responded in the affirmative. Counsel also asked Villegas if he was given an extension of time because defendant's arrest occurred some three months after the expiration of the original contract. Villegas admitted that he had been given an extension. Villegas further admitted that he had aided police in the arrest of an individual known as Armando on April 12, 1990. Counsel proceeded to develop another line of questioning. He then returned to the subject of the time extension, seeking to determine the expiration date of the extension. Objections to these two questions were sustained on the grounds that they had been asked and answered.

In its redirect examination, the prosecutor established that the extension was to expire on May 30, 1989. Although invited to re-cross-examine the witness, defense counsel declined.

The sixth amendment to the United States Constitution protects the defendant's right of cross-examination. (*Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.) The exposure of a witness' motivation in testifying is a proper and important function of that right. (*Davis v. Alaska*, 415 U.S. at 316-17, 39 L. Ed. 2d at 353-54, 94 S. Ct. at 1110.) Although the scope of the cross-examination lies within the discretion of the circuit court, that discretion must be exercised in such a way as to allow the defendant wide latitude in establishing bias, motive, or interest by that witness. *People v. Wilkerson* (1981), 87 Ill. 2d 151, 429 N.E.2d 526.

■ In the present case, the crux of defendant's argument is that the defense "twice attempted to adduce when Villegas' contract extension terminated but the court sustained objections each

time. The date Villegas' contract extension terminated was directly relevant to demonstrating Villegas' bias, interest, and motive to testify falsely." We agree that the trial judge improperly sustained the objections to defense counsel's questions. Despite this error, however, defense counsel established that defendant's arrest represented the final arrest under the agreement and the fact that Villegas benefitted from it. Moreover, the information counsel sought to elicit, the expiration date of the contract extension, was brought out in redirect examination. Inexplicably, defense counsel did not re-cross-examine the witness although given the opportunity to do so by the circuit court. Had that information not been elicited during redirect examination, defendant's argument would be meritorious and this court could have found reversible error. (See *People v. Perez* (1991), 209 Ill. App. 3d 457, 568 N.E.2d 250 (it is reversible error, in entrapment case, to limit defense counsel's inquiries to informant because such a case turns on witness credibility).) However, we hold that reversal is unwarranted in the present case in view of defense counsel's failure to follow up on the very information now asserted as error.

Defendant next maintains that she received ineffective assistance of counsel when her trial counsel failed to file a motion to suppress evidence obtained during an illegal search.

Generally, in order to establish ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for the error, the result of the trial would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) In adopting *Strickland*, our supreme court noted that a defendant bears a heavy burden to overcome the strong presumption in favor of a finding that defense counsel's advocacy was effective. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) Further, the determination of the reasonableness of trial counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, without hindsight, in light of the totality of the circumstances. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2051.

The basis for defendant's claim of ineffectiveness is that the warrantless police entry into and subsequent search of her home following her arrest did not fall under any of the exceptions to the requirement of first obtaining a warrant.

This issue was addressed by the supreme court in *People v. Eichelberger* (1982), 91 Ill. 2d 359, 438 N.E.2d 140, *cert. denied* (1982), 459 U.S. 1019, 74 L. Ed. 2d 514, 103 S. Ct. 383. There, the court held that the warrantless entry into defendant's residence, a hotel room, for the purpose of effecting an arrest during a drug buy did not violate defendant's fourth amendment rights because police reasonably believed that a felony was being committed. (*People v. Eichelberger*, 91 Ill. 2d at 370.) That arrest being valid, the officers then had the right to conduct a contemporaneous search of defendant's person and the area within her immediate control. *People v. Eichelberger*, 91 Ill. 2d at 371.

Parenthetically, we note that defendant allowed Villegas into her home. Villegas then motioned for Trejo to join them. When Trejo entered the living room, he was introduced to defendant, who shook hands with him and asked him to follow her into a bedroom, where the cocaine was shown to him. This type of scenario has been recognized by our courts as a consensual entry. See *People v. Galdine* (1991), 212 Ill. App. 3d 472, 571 N.E.2d 182, *appeal denied* (1991), 141 Ill. 2d 549, 580 N.E.2d 123; *United States v. Scherer* (7th Cir. 1982), 673 F.2d 176, *cert. denied* (1982), 457 U.S. 1120, 73 L. Ed. 2d 1334, 102 S. Ct. 2935.

■ Given that defendant's arrest was obtained legally, defendant's assertions regarding her "tainted" consent to search form necessarily must fail.

As the foregoing analyses show, trial counsel did not act unreasonably in failing to present a motion to suppress evidence. It has been recognized that "[d]efense counsel has no duty to advance specious claims of constitutional deprivation." (*People v. Gray* (1981), 95 Ill. App. 3d 879, 884, 420 N.E.2d 856.) Defendant, therefore, has failed to meet her burden in establishing that counsel was ineffective.

Defendant next contends that several comments made by the prosecutor during closing argument operated to deny her a fair trial. The State responds that the claim is waived due to defendant's failure to make either a contemporaneous objection or to include the issue in her post-trial motion.

■ Our supreme court has held repeatedly that a defendant must both make a contemporaneous objection at trial and include the issue in the post-trial motion in order to preserve properly a claim of error for appellate review. (See, *e.g.*, *People v. Pasch* (1992), 152 Ill. 2d 133, 604 N.E.2d 294; *People v. Turner* (1989), 128 Ill. 2d 540, 539 N.E.2d 1196, *cert. denied* (1989), 493 U.S. 939,

107 L. Ed. 2d 326, 110 S. Ct. 337; *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Indeed, none of the contentions made by defendant in this court were included in her post-trial motion. Accordingly, they are waived. However, defendant asks that we excuse the waiver under the plain error exception to the waiver rule. (134 Ill. 2d R. 615(a).) That exception is invoked in instances where the evidence is closely balanced or where the alleged error deprived defendant of a fair and impartial trial. (*People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E.2d 743.) Although defendant argues that the evidence as to her predisposition to commit crime was closely balanced, the evidence, set forth in detail above, as to predisposition was to the contrary. Moreover, none of the errors complained of here appear to be so substantial as to warrant the application of the second prong of the waiver exception. For these reasons, we decline to excuse the waiver.

Finally, defendant claims that her 13-year prison sentence should be reduced by one year to the statutory minimum of 12 years. She maintains that the trial judge impermissibly increased her sentence based upon his consideration of factors which are inherent in the offense, namely the amount of cocaine involved and the harm to society caused by the drug trade. Additionally, she argues that the trial judge did not give sufficient consideration to the mitigating factors, including that she was a 53-year-old mother of nine and grandmother of three, with no prior criminal background.

Sentencing is discretionary with the circuit court and will not be changed upon review absent an abuse of that discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915.) There exists a presumption that the circuit court based its sentence on proper legal reasoning, and for that reason, reviewing courts are reluctant to reduce a sentence which is within the applicable statutory guidelines. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 372 N.E.2d 641.

■ It should be noted that the sentence imposed in the present case falls within the applicable statutory guidelines. Defendant was convicted of the delivery of 495.1 grams of 87.4% pure cocaine, which carries a sentencing range of not less than 12 years and not more than 50 years. (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)(C).) Additionally, defendant's argument regarding factors inherent in the offense has been rejected by the appellate court. In *People v. Peter* (1991), 220 Ill. App. 3d 626, 581 N.E.2d 128, *appeal denied* (1992), 143 Ill. 2d 645, 587 N.E.2d 1022, the fifth division of

this court noted that it is not improper for the circuit court to have noted the amount of the drug at issue when deciding what might be an appropriate sentence within the sentencing range. (*People v. Peter*, 220 Ill. App. 3d at 632.) Indeed, the quantity of a drug in excess of the minimum, 400 grams, but less than 900 grams, "is susceptible to the same range of sentencing." (*People v. Peter*, 220 Ill. App. 3d at 632.) Accordingly, the fact that defendant delivered a quantity of drugs in excess of the minimum for that sentencing range and the fact that the drug had a high purity level, "indicating its potency and potential for having a far-reaching impact on society" (*People v. Peter*, 220 Ill. App. 3d at 632) are considered factors which the circuit court may properly take into account when setting sentence. Furthermore, the trial judge indicated that it had considered defendant's lack of criminal background as a factor in mitigation. For these reasons, no abuse of sentencing discretion is apparent in the present case.

Defendant's conviction and sentence are affirmed.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.