First Division

December 28, 1998

Nos. 1-97-1568 & 1-97-1754 (Consolidated)

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

MILTON RIVAS and DANIEL COLON,

Defendants-Appellants.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County.

Honorable

Thomas R. Sumner,

Judge Presiding.

JUSTICE TULLY delivered the opinion of the court:

Defendants, Milton Rivas and Daniel Colon, were charged with delivery of a controlled substance.  The trial court denied defendants' motions to suppress evidence and to produce the State's confidential informant.  Following a jury trial, defendants were convicted, and the court sentenced Rivas and Colon to 25 and 15 years in prison, respectively.  Defendants' consolidated appeal of their convictions is made pursuant to Supreme Court Rule 603 (155 Ill. 2d R. 603).

For the reasons which follow, we affirm.

FACTUAL BACKGROUND

Before trial, Rivas moved to suppress the contents of tape recordings of his conversations with the undercover police officer in the case.  Rivas argued that the trial court improperly granted authorization for the eavesdropping device in violation of sections 108A-3 and 108A-4 of the Code of Criminal Procedure (725 ILCS 5/108A-3, 108A-4 (West 1992)).  The trial court denied the motion.  The trial court also denied Rivas' motion to produce the confidential informant in the case.

At trial, Chicago police officer Sabina Carlson testified for the State.  The police were investigating Rivas on October 1, 1992, when Officer Carlson and a confidential informant known as Martha went to Avik Auto Sales (Avik) to meet with Rivas about buying drugs from him.  Officer Thomas Ptacek had introduced the confidential informant to Officer Carlson.  Officer Carlson introduced herself to Rivas as Patricia Martinez and told him that she wanted to buy cocaine from him.  He told her that he had five big drug clients.  Rivas said that he would check her background, and that if it satisfied him and his partners, she could buy as much cocaine as she wanted.  He told Officer Carlson that he did not want to know where her money came from or who the drugs were for, and that he did not want to talk to her on the phone.  Officer Carlson later wrote a report about the meeting, and the police created a fictitious background for her under the name Patricia Martinez.

Officer Carlson met with Rivas again on October 29, 1992.  Surveillance officers watched her go into the Avik sales office alone.  Rivas performed the background check to his satisfaction.  Officer Carlson asked if she could start by buying a small amount of cocaine, in order to sample the quality.  He said that it would be easier for him to get a large amount.  Although Martha suggested that he sell the cocaine for $10,500 per kilogram, he and Officer Carlson negotiated on a price of $11,500 per kilogram.  Officer Carlson called Rivas on November 4, 1992, and he told her that the "car," meaning the cocaine, would be at Avik that day.  When she arrived, Rivas took a small chunk of white powder from his desk and told her that it was a sample from the kilogram of cocaine that she was buying.  Officer Carlson then gave Rivas money from the police department to pay for the cocaine.  Rivas said that the agreed price was $12,500, and she said that it was $10,500.  They agreed on $11,500, and she told him that she would bring the other $1,000 later that day.  Rivas then went to the door and told Victor Echevaria, an Avik employee, to bring him his "sandwich."  Echevaria came back a few minutes later with a small paper bag and handed it to Rivas, who took out a plastic bag and handed it to Officer Carlson.  He told her that the "stuff" was inside.  Officer Carlson took the bag, gave Rivas her pager number, and left.  She brought the cocaine back to the police station, inventoried it and, prepared a request for a recording device to tape future conversations between herself and Rivas.  She went back to Avik later that night to pay Rivas the other $1,000.  When she left the office, Rivas told her that they would be seeing each other again for another cocaine deal.

Rivas paged Officer Carlson on November 7, 1992.  He asked her what she thought of the drugs, and she said she was upset because she had received less than one-half of a kilogram of cocaine.  On November 12, 1992, Officer Carlson obtained a court order allowing her to tape record her conversations with Rivas.    They met again on November 17, 1992 to discuss another drug deal and to discuss whether she had received less cocaine than she had paid for.  Officer Carlson taped the conversation.  Rivas told her that he had fired his runner - the person who carried the drugs - because he had had problems with him before.  He also said that the more drugs she bought, the cheaper they would be.  Rivas said that the next time she bought drugs, she would have to go to a different location and she would receive them from a woman.  He did not want the money and the cocaine in the same place in case the police caught him.  Rivas told her a story about another customer who owed him money and paid him with interest when Rivas found him.  He also told Officer Carlson that when his organization transported drugs they would use two cars.  The "load car" would carry 100 kilograms of cocaine and another car would be nearby to get into an accident if the police stopped the "load car."  The State played the tape of that conversation for the jury.

Officer Carlson testified that she went back to Avik on November 20, 1992 to tell Rivas that she wanted to buy eight and one-half kilograms of cocaine the next time she came to see him, and he said that she could.  On November 30, 1992, Rivas told her that he could not get that amount for her because she had not dealt with him often enough, but that after she bought smaller quantities, he could sell her that amount.  Rivas also explained that he did not want to have too much money at Avik because he wanted to say that the money had come from car sales if the police asked him about it.  They agreed on a total price of $33,500 for one and one-half kilograms of cocaine that she was to buy that day.  Officer Carlson left and returned later that day to buy the cocaine.  When she arrived at Avik, she saw Nestor Solis standing outside the office trailer.  She paid Rivas in the office.  He then received a phone call and told her that the drugs would be there in 10 minutes.  Rivas received another call and said "I'll be right there."  He told Officer Carlson that he would be back and to wait in the office.  She insisted on going with him.  They went outside and Rivas told her to look at cars while he went into another trailer.  Officer Carlson saw Solis and Colon, the other defendant, standing near the trailer.  Rivas spoke to Colon for a few minutes and they went into the trailer.  Solis stayed outside, watching Officer Carlson.  Colon came out a few minutes later, went to a black Jeep parked in the lot, took a blue and pink box out of the Jeep, and went back into the office.  A few minutes later, Colon came back out of the trailer without the box, and passed Officer Carlson as she went to the trailer.  The box was on the table when Officer Carlson went into the office.  Rivas removed a foil package from it and removed a plastic bag of white powder from the foil package.  Officer Carlson brought the white powder back to the police station for lab testing.  

On cross-examination, Officer Carlson testified that she did not know why Rivas had come under investigation and did not know if any police officers had met with Rivas before she had met him.  She had not known the informant before Officer Ptacek had introduced them, and she did not know why the informant was helping the police.  The informant was not present during any of the drug deals with Rivas.  Officer Carlson also testified that she contacted Rivas 7 to 10 times during the investigation, and that there were several times when Rivas could not produce the drugs.  She never saw Colon at the car lot other than on November 30, 1992, and his voice never appeared on the tape recordings.

Rivas again moved to produce the confidential informant after Officer Carlson's testimony.  The trial court denied the motion and found that the informant was not a "transactional" informant for disclosure purposes because she was only present for the original introduction of Rivas to Officer Carlson.

Officer Ptacek testified that the confidential informant told him that Rivas was selling large amounts of cocaine and told her that he was looking for customers.  The informant had been working with the police for six months before the investigation, and the police paid her $2,500 for her help.  Officer Ptacek introduced Officer Carlson to the informant and told her not to be in contact with Rivas after she introduced Rivas to Officer Carlson. 

On November 30, 1992, Officer Ptacek withdrew $33,500 in pre-recorded funds from the bank for Officer Carlson's purchase of the one and one-half kilograms of cocaine.  Later that day, he watched Colon drive to Avik in a black Jeep and go into the sales office.  Colon came back out to the Jeep and took out a blue and pink box.  He brought the box to the office, then came back out without the box and drove away.  Officer Ptacek saw Officer Carlson a few minutes later carrying the same box.  When Officer Carlson gave him the signal for the arrest, he arrested Solis and Rivas.  He saw cocaine on the desk, which Rivas explained was for personal use.  He and other police officers also found $1,500 of the pre-recorded police money, the credit report for Patricia Martinez, and a piece of paper with dollar amounts written on it from the drug price negotiations between Rivas and Officer Carlson.  Officer Ptacek also arrested Echevaria, the Avik employee.  On December 1, 1992, after a custodial search of the Jeep, Officer Ptacek found a Cobra cellular telephone which appeared to have come from the blue and pink box.   On cross-examination, he testified that he did not know whether the confidential informant had any subsequent contact with Rivas.  He also stated that he never subpoenaed the telephone records for Rivas' home phone or the Avik phone.  He never saw Rivas make a drug deal with anyone other than Officer Carlson during the investigation.  The first time he saw Colon was on November 30, 1992.  

Chicago police officer Anthony Luna testified that on November 30, 1992, he was watching the car dealership.  Over the radio, he heard that Officer Carlson was going into the car lot and that a Jeep was arriving.  Officer Luna was told that the person in the Jeep, Colon, was involved in the drug transaction and that he had the money.  Officer Luna and other officers followed Colon and asked him to get out of the Jeep.  Colon refused, and the officers arrested him.  They found $32,000 packaged in bundles of $1,000.  At the police station, they found $656 in Colon's pocket, which he told them was drug money.  On cross-examination, Officer Luna testified that his only involvement with the investigation was Colon's arrest.  He said that Colon spoke English fluently and seemed to understand everything that the officers said to him.  

Rivas testified that he met Officer Carlson on October 1, 1992 through a woman named Martha.  Martha had told him that she knew a way that he could make money by selling drugs.  Between June and August 1992, Martha called and visited him almost every day, and each time she discussed doing a drug deal with him.  Rivas originally said that he was not interested, but he became interested when he learned how easy it would be to make money.  Martha told him that he only had to provide a safe exchange point for the deals, and that she would bring him the customers and supply him with the drugs.  At the end of September 1992, Rivas agreed to the deal because he had financial troubles.  According to Rivas, Martha coached him on how to play the role of a big drug dealer.  On October 1, 1992, Martha brought Officer Carlson to the Avik car lot and introduced her to Rivas.  Rivas stated that Martha participated in the conversation between him and Officer Carlson, and that it was Martha's idea for him to tell Officer Carlson that he would have to check her background.  Martha coached him on what to do and say during his dealings with Officer Carlson.

Officer Carlson contacted Rivas several times after their first meeting and tried to buy large amounts of cocaine.  A few times, Rivas could not sell her cocaine because Martha had not supplied him with any.  When he and Officer Carlson agreed on a smaller amount and price for the cocaine, the plan was that someone would deliver the drugs to him at the car dealership and that he would take the money from Officer Carlson, keep his commission, and give the rest to the person who delivered the drugs.  According to Rivas, he contacted Officer Carlson after the deal on November 4, 1992 because he liked making the $1,500 he got as a commission.  

Rivas used cocaine in the past but was not addicted.  Officer Carlson was the only customer Martha ever brought to him.  He did not have Martha's or Officer Carlson's phone number, but he did receive Officer Carlson's pager number after the deal on November 4, 1992.  He never heard from Martha after his arrest.  He had not known Colon before November 30, 1992.

On cross-examination, Rivas testified that he started working for Avik in January 1991, and that he was the sales manager in charge when his boss was not present.  His salary was approximately $30,000 per year, plus a 17.5% commission on any car that he sold.  Echevaria and Solis worked at Avik under his supervision.  Rivas used cocaine occasionally and knew where to get it if he wanted it.  Martha never threatened or coerced him into dealing drugs and he never mentioned to Officer Carlson that Martha was his cocaine supplier.  Rivas acknowledged that there were a few times when Officer Carlson threatened not to deal with him, and he convinced her to give him another chance.

The jury found Rivas guilty of delivery of a controlled substance of 900 grams or more for the November 30, 1992 sale, and of 400 grams or more for the November 4, 1992 sale.  The jury found Colon guilty of delivery of a controlled substance of 900 grams or more for the November 30, 1992 sale.  Defendants' post-trial motions were denied.  At the sentencing hearing, the State presented testimony that Colon owned a boat, property in Puerto Rico, a Jeep Cherokee and a Chevrolet Blazer, and that he had money, jewelry, and guns in a safe in his house.  Colon had no prior convictions.  Rivas had a prior conviction in 1976 for armed robbery in New Jersey.  He did not own any extravagant items.  The trial court sentenced Rivas and Colon to 25 and 15 years in prison, respectively.         

ISSUES PRESENTED FOR REVIEW

On appeal, Colon argues that: (1) the State failed to prove beyond a reasonable doubt that he knew that the package he delivered contained cocaine; (2) the trial court erred in admitting a witness's hearsay statements about his activities; and (3) the trial court erred in admitting a police report, which was hearsay and was not covered by any hearsay exceptions.

Rivas contends that: (1) he produced entrapment evidence at trial and the State failed to prove beyond a reasonable doubt that he was not entrapped; (2) the trial court erred in denying his motion to produce the State's confidential informant and therefore denied his sixth amendment right to confront witnesses against him; and (3) the trial court erred in denying his motion to suppress the contents of recordings made with an eavesdropping device pursuant to a court order.

OPINION

I.  Defendant Colon's Appeal

Colon first argues that the State failed to prove beyond a reasonable doubt that he knew that the package he delivered to Rivas contained cocaine.  According to Colon, the State failed to introduce any evidence on the element of knowledge, and his conviction must be reversed.   

To support a conviction for delivery of a controlled substance, the State must establish that the defendant had: (1) knowledge of the presence of a controlled substance, (2) the controlled substance within his or her immediate control, and (3) the intent to deliver it.  
People v. Pintos
, 133 Ill. 2d 286, 549 N.E.2d 344 (1989).  The element of knowledge can rarely be proven directly, and it is established by the defendant's actions, declarations or conduct from which the trier of fact may infer that the defendant knew of the existence of the controlled substance.  
Pintos
, 133 Ill. 2d 286, 549 N.E.2d 344; 
People v. Newman
, 211 Ill. App. 3d 1087, 569 N.E.2d 1089 (1991).  Whether a defendant had knowledge of the controlled substance is a question of fact for the trier of fact.  
People v. Loferski
, 235 Ill. App. 3d 675, 601 N.E.2d 1135 (1992).  In criminal cases where the sufficiency of the evidence is at issue, the proper standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  
People v. Collins
, 106 Ill. 2d 237, 478 N.E.2d 267 (1985).  The trier of fact is able to observe the witnesses' demeanor, determine their credibility (
People v. Washington
, 240 Ill. App. 3d 688, 608 N.E.2d 546 (1992)) and draw reasonable inferences from the evidence (
People v. Tye
, 141 Ill. 2d 1, 565 N.E.2d 931 (1990)).  Thus, a finding of knowledge by the trier of fact will not be set aside on review unless the evidence is so contrary to the verdict, or so unreasonable or unsatisfactory that a reasonable doubt as to guilt exists.  
People v. Valentin
, 135 Ill. App. 3d 22, 480 N.E.2d 1351 (1985).

In the present case, it was not unreasonable for the jury to have found from Colon's actions and conduct that he knew the box contained cocaine.  Officers Carlson and Ptacek testified that Colon arrived at Avik's car lot when Officer Carlson was there to buy one and one-half kilograms of cocaine from Rivas.  At that time, Colon talked to Rivas for a few minutes and then went to his Jeep to get the box which was later found to contain the drugs.  In addition, Officer Luna testified that Colon attempted to flee when he and his partner stopped Colon after the drug transaction.  When they arrested him, they found $32,000 packaged in $1,000 bundles in the Jeep.  Furthermore, at the police station, Colon told the police that the $656 found in his pocket was drug money.  In light of the foregoing, it was not unreasonable for the jury to find that Colon knew that Officer Carlson came to buy drugs and that he knowingly delivered the cocaine.

Colon's next argument is that the trial court erred in admitting Officer Luna's statements about his activities because they were hearsay and not covered by any hearsay exceptions.  Colon contends that it was error for the court to allow Officer Luna to testify about what Officer Ptacek told him over the police radio.  According to Officer Luna, Officer Ptacek described Colon carrying a package to the Avik sales office, returning to his Jeep, and driving away.  When Colon's counsel objected to Officer Luna's testimony, the court stated, "He can testify what he heard over the radio that was transmitted to him."     "To qualify as hearsay, an out-of-court statement must be offered to establish the truth of the matter asserted."  
People v. Simms
, 143 Ill. 2d 154, 171, 572 N.E.2d 947, 953 (1991).  Hearsay evidence "is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule."  
People v. Olinger
, 176 Ill. 2d 326, 357, 680 N.E.2d 321, 336 (1997).  "[I]t is for the trial court to determine by the totality of the circumstances whether it considers the hearsay statement to be trustworthy."  
People v. Swaggirt
, 282 Ill. App. 3d 692, 700, 668 N.E.2d 634, 639 (1996).  "Because the admission of evidence is within the trial court's sound discretion, a reviewing court will not reverse the trial court's decision absent a clear showing of abuse of that discretion."  
People v. Thomas
, 171 Ill. 2d 207, 216, 664 N.E.2d 76, 81 (1996).

The content of a police radio message is not hearsay if it is offered for the limited purpose of explaining the reason and manner in which the police conducted their investigation.  
People v. Louisville
, 241 Ill. App. 3d 772, 609 N.E.2d 682 (1992).  A police officer may testify to the contents of police radio communications where such testimony is offered to show that the police officer had probable cause to arrest on the basis of the communication.  
People v. Williams
, 62 Ill. App. 3d 966, 379 N.E.2d 1268 (1978).  There is no prejudicial error in introducing evidence of the police officer's testimony in circumstances surrounding the defendant's arrest where it was an integral part of the narrative of the police investigation of the crime leading to the arrest.  
People v. Orr
, 149 
Ill. App. 3d 348, 500 N.E.2d 665 (1986).

After a careful review of the record, we find that the trial court did not abuse its discretion in allowing Officer Luna's testimony.  Officer Luna testified that he could not see what was happening in the Avik car lot on the day of the drug transaction between Rivas and Officer Carlson.  Officer Luna heard over the radio that Colon had driven to the lot, carried a box into the office, and left apparently carrying something.  He heard that Colon was driving away from the lot in his direction, and heard the license plate number of Colon's Jeep.  After hearing this information, Officer Luna and his partner arrested Colon as a participant in the drug deal.  Officer Luna's testimony was properly admitted for the limited purpose of explaining why he arrested Colon and it did not constitute hearsay.  However, even assuming that the trial court erred in admitting the evidence, any error was harmless in light of the overwhelming evidence against Colon.  See 
People v. Carlson
, 92 Ill. 2d 440, 442 N.E.2d 504 (1982).

Colon's last argument is that the trial court erred in admitting a police report, which he contends was hearsay and was not covered by any exceptions.  The court allowed the State to introduce a sheet containing information concerning the pre-recorded funds that the police department issued to Officer Carlson to buy the cocaine.  Colon argues that the sheet is a police report and should not have been admitted into evidence.  The Code of Criminal Procedure states that:

"[n]o writing or record made in the regular course of any business shall become admissible as evidence by the application of this Section if: 

* * *

[s]uch writing or record has been made by anyone during an investigation of an alleged offense or during any investigation relating to pending or anticipated litigation of any kind."  725 ILCS 5/115-5 (West 1992).

The State argues that the sheet used to record the funds used for the drug purchases was not a police report for section 115-5 purposes.  We agree with the State that the pre-recorded funds sheet qualifies as a "routine, ministerial and non-evaluative matter, the preparation of which would indicate trustworthiness."  See 
People v. Flippen
, 46 Ill. App. 3d 246, 360 N.E.2d 1183 (1977).  The police merely recorded the serial numbers of the money to be used in the drug transaction.  Such a document is not likely to indicate a bias or prejudice against defendant.  Moreover, even if the court erred in admitting the pre-recorded funds sheet, any such error was harmless in light of the overwhelming evidence against Colon.  See 
Carlson
, 92 Ill. 2d 440, 442 N.E.2d 504. 

II.  Defendant Rivas' Appeal 

Rivas first contends on appeal that he produced evidence at trial that he was entrapped as a matter of law and that the State failed to prove beyond a reasonable doubt that he was not entrapped.  According to Rivas, he and Martha discussed their financial difficulties and she originated the idea for him to sell cocaine.  Rivas argues that he refused several times, but that Martha continued to contact him.  He contends that he was not predisposed to sell the drugs and that Martha and Officer Carlson cultivated relationships with him "exclusively designed to induce [him] to sell drugs."  Furthermore, Rivas argues that there was no evidence of his willingness to accommodate the needs of drug users.  

A defendant who raises entrapment as an affirmative defense to a criminal charge necessarily admits to committing the crime, albeit because of improper governmental inducement.  
People v. White
, 249 Ill. App. 3d 57, 618 N.E.2d 889 (1993).  Once a defendant presents some evidence, however slight, to support an entrapment defense, the State bears the burden to rebut the entrapment defense beyond a reasonable doubt.  
People v. Alcala
, 248 Ill. App. 3d 411, 618 N.E.2d 497 (1993).  The question of entrapment is usually one to be resolved by the trier of fact, and it will not be disturbed on review unless the reviewing court finds that a defendant was entrapped as a matter of law.  
People v. Tipton
, 78 Ill. 2d 477, 401 N.E.2d 528 (1980).  The relevant inquiry for a reviewing court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Collins
, 106 Ill. 2d 237, 478 N.E.2d 267; 
People v. Lambrecht
, 231 Ill. App. 3d 426, 595 N.E.2d 1358 (1992).  A reviewing court may not substitute its judgment for that of the trier of fact with respect to the weight of evidence or the credibility of the witnesses.  
People v. Campbell
, 146 Ill. 2d 363, 586 N.E.2d 1261 (1992).  

In order to support a finding of entrapment, the evidence must show that the defendant lacked the predisposition to commit the crime, and that the State improperly induced him or her to do so.  
People v. D'Angelo
, 223 Ill. App. 3d 754, 585 N.E.2d 1239 (1992); 720 ILCS 5/7-12 (West 1992).  A person is not guilty of an offense if his or her conduct is incited or induced by the State for purposes of obtaining evidence against that person for his or her prosecution.  
People v. Poulos
, 196 Ill. App. 3d 653, 554 N.E.2d 448 (1990); 720 ILCS 5/7-12 (West 1992).  However, merely affording an opportunity for the criminal act does not constitute entrapment.  
Poulos
, 196 Ill. App. 3d 653, 554 N.E.2d 448; 720 ILCS 5/7-12 (West 1992).  Entrapment will not be found merely because a government official initiated a transaction with a defendant that led to the sale of a controlled substance.  
People v. Darnell
, 214 Ill. App. 3d 345, 573 N.E.2d 1252 (1990).  The factors to consider when determining whether a defendant was predisposed to commit the crime include: (1) the defendant's initial reluctance or readiness to commit the offense; and in drug cases, (2) the defendant's familiarity with drugs; (3) his or her willingness to accommodate the drug user's needs and to make a profit from the illegal conduct; (4) whether the defendant had a ready source to supply the drugs; (5) the defendant's own prior or current use of illegal drugs; and (6) his or her participation in testing or cutting the drugs.  
Lambrecht
, 231 Ill. App. 3d 426, 595 N.E.2d 1358.  Predisposition is determined through a factual analysis of the case.  
People v. Katsigiannis
, 171 Ill. App. 3d 1090, 526 N.E.2d 508 (1988).

Our review of the record shows that a rational trier of fact could have found beyond a reasonable doubt that defendant was predisposed to sell the cocaine and that the State did not improperly induce him to do so.  Officer Ptacek, who introduced the informant to Officer Carlson, testified that the informant told him Rivas was selling large amounts of cocaine and was looking for customers.  When the confidential informant introduced Officer Carlson to Rivas, Rivas had been under police investigation.  In addition, Rivas showed an initial readiness to sell cocaine.  Rivas testified that the first time that the confidential informant brought up the idea of selling drugs, he said that he was interested.  Subsequently, he told her that he was not interested, but continued to listen to Martha and did not discourage her from talking about selling drugs.  Rivas was familiar with cocaine because he had used it before his dealings with Officer Carlson.  Moreover, he was familiar with some terminology of the drug trade and with methods of transporting large amounts of cocaine without getting caught.  He told Officer Carlson that one method was to use a decoy car to travel with the delivery or "load" car.  If the police stopped the "load" car, the decoy car would cause an accident to distract the police.  Also, Rivas showed a willingness to accommodate Officer Carlson's cocaine requests and a willingness to make a profit from the cocaine sales.  He claimed to have five other clients and told Officer Carlson a story about finding a client who owed him money and making him pay with interest.  Rivas told Officer Carlson that he did not want to lose everything he had worked for and that he did not like to keep the cocaine and money in the same place in case the police investigated him.  In addition, Rivas gave Officer Carlson a cocaine sample before she bought any.  After his first deal with Officer Carlson, he contacted her to sell her more cocaine because he liked making the money.  Additionally, he negotiated a higher price for the cocaine than the one Martha suggested because he wanted to increase his commission.  According to Officer Carlson, she contacted Rivas about 7 to 10 times in the course of their dealings over 2 months.  Rivas indicated to her that he was knowledgeable in the drug trade.  He told her that he always wanted her to come alone to see him and that he did not want to talk over the phone.  Rivas said that he could get her any amount of cocaine that she wanted and that it was best if she bought it in large quantities.  

Rivas argues in part that he was entrapped because he had financial difficulties and needed to make money from the drug deals.  However, there was contrasting evidence of his financial situation.  Rivas was paid just under $30,000 per year plus commissions at Avik and his wife owned her own business.  Rivas had race track receipts for winnings over $600 which he had signed for tax purposes, and receipts for winnings under $600 that he kept for his own records.  Moreover, his landlord testified that Rivas sometimes paid his monthly $550 rent in cash. 

Rivas relies upon several cases, 
People v. Day
, 279 Ill. App. 3d 606, 665 N.E.2d 867 (1996), 
People v. Kulwin
, 229 Ill. App. 3d 36, 593 N.E.2d 717 (1992), and 
People v. Martin
, 124 Ill. App. 3d 590, 464 N.E.2d 837 (1984), in which the appellate court reversed the defendants' convictions for delivery of a controlled substance because of entrapment.  They are distinguishable from this case.  In 
Day
, an informant dated the defendant and asked him to get cocaine for her and a "friend," who was an undercover police officer.  The defendant initially stated that he did not know how to get drugs for her, and that he did not use drugs.  He was not familiar with drug trade terminology.  After the defendant made his first drug sale for a $10 profit, he did not return the undercover officer's phone and pager calls.  The defendant eventually agreed to another drug sale in which he did not make a profit.  The officer later contacted the defendant frequently until he delivered more cocaine to her.  In 
Kulwin
, the defendant had about $20,000 in debts he could not pay.  The defendant approached the informant in the case and asked him several times if he could borrow money.  The informant was a drug dealer who had a deal with the police to cooperate with them for reduced charges.  The informant told the defendant that he could sell cocaine to pay his debts, and introduced him to the uncover police officer in the case.  The defendant later delivered drugs from the informant to the undercover officer.  Finally, in 
Martin
, the informant pressured the defendant for six months to sell drugs.  The informant enticed the defendant to use drugs and then called the defendant's house over 30 times while he was trying to recover from his drug use.  The defendant repeatedly refused the informant's and the undercover police officers' requests to sell drugs after he had conducted a sale.  The defendant agreed to more sales when the informant told the defendant that he was in trouble and needed a favor, which the defendant owed him for helping the defendant in the past.  Moreover, the evidence showed that the defendant never made a profit from any of the drug sales and that the informant received all of the money from the sales. 

Those cases differ from the present case.  The evidence did not reveal that Rivas was in debt, as opposed to the defendant in 
Kulwin
.  Additionally, unlike the defendant in 
Kulwin
, although the informant received money from the police, she was not a drug dealer with a pending action against her and therefore was not striking a deal with the police for a lesser charge, unlike the defendant in 
Kulwin
.  Also, whereas the defendants in 
Day
, 
Kulwin
, and 
Martin
, received little or no profit from their drug dealings, Rivas profited $1500 from each of the drug sales, and even negotiated to increase his profit.    Also, there was no evidence of coercion similar to that found in the cases upon which Rivas relies.  Officer Carlson contacted Rivas only 7 to 10 times over 2 months, and Rivas contacted her on his own after their first drug deal.  Furthermore, Rivas never told Officer Carlson that he was not interested in selling her cocaine.  A reasonable juror could have found beyond a reasonable doubt that Rivas was not entrapped.  

Rivas next argues that the trial court erred in denying his motions to produce the State's confidential informant and therefore he was denied his sixth amendment right to confront witnesses against him.  In determining whether a confidential informant's identity should be disclosed, a court should balance the strong public policy reasons favoring secrecy, namely the protection of informants, against a defendant's need for disclosure in order to prepare his or her defense.  
People v. Witherspoon
, 216 Ill. App. 3d 323, 576 N.E.2d 1030 (1991).  In deciding whether to disclose an informant's identity, courts must balance the value of informants to effective law enforcement and their protection against the defendant's constitutional rights.  
Rovario v. United States
, 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623 (1957); 
People v. Raess
, 146 Ill. App. 3d 384, 496 N.E.2d 1186 (1986).  Where the confidential informant is not a participant or a material witness to the essential elements of the offense, his or her identity can be withheld.  
People v. Herrera
, 238 Ill. App. 3d 284, 606 N.E.2d 267 (1992); 
People v. Velez
, 204 Ill. App. 3d 318, 562 N.E.2d 247 (1990).  The defendant bears the burden of establishing that the informant is able to testify to facts bearing on the charged offense.  
Witherspoon
, 216 Ill. App. 3d 323, 576 N.E.2d 1030.

In the present case, Rivas' argument that Martha was a material witness is contradicted by the record, and we do not find that the trial court erred in denying Rivas' motions to produce the confidential informant.  Rivas testified that Martha supplied the drugs and coached him about the drug sales.  Officer Carlson testified that Martha was only present for a small part of her conversation with Rivas at the initial introduction and that Martha did not participate in the conversation.  At the original meeting, there was no negotiation for the sale of drugs.  Officer Carlson testified that she never saw Martha again after she introduced her to Rivas.  The evidence showed that the informant was never present during any of Rivas' cocaine sales to Officer Carlson, and therefore not a participant or a material witness to the essential elements of Rivas' delivery of cocaine to Officer Carlson.

    Rivas' final argument is that the trial court erred in denying his motion to suppress the contents of the eavesdropping device recordings.  According to Rivas, the court order allowing the recordings that Officer Carlson obtained was not based upon reasonable cause.  For purposes of motions to suppress, the trial court is in the best position to determine the credibility of witnesses, to weigh testimony, and to resolve conflicts in testimony because it has heard the testimony and observed the demeanor of the witnesses.  
People v. Frazier
, 248 Ill. App. 3d 6, 617 N.E.2d 826 (1993).  When reviewing a trial court's determination on a motion to quash an arrest and suppress evidence, we are not limited to the evidence presented at the pretrial hearing and we may consider evidence adduced at trial.  
People v. Sims
, 167 Ill. 2d 483, 658 N.E.2d 413 (1995); 
People v. Barlow
, 273 Ill. App. 3d 943, 654 N.E.2d 223 (1995).  In cases in which a motion to suppress turns on the weight and credibility of the evidence, the circuit court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous.  
People v. Kozlowski
, 278 Ill. App. 3d 40, 662 N.E.2d 630 (1996); see also 
People v. Dilworth
, 169 Ill. 2d 195, 661 N.E.2d 310 (1996).  A ruling is manifestly erroneous if it is "palpably erroneous and wholly unwarranted or arbitrary, unreasonable, and not based upon the evidence."  
People v. Mason
, 274 Ill. App. 3d 715, 719, 653 N.E.2d 1371, 1373 (1995).

Under section 108A-4(b) of the Code of Criminal Procedure, an eavesdropping order may be issued where there is a reasonable cause for believing that an individual is committing, has committed, or is about to commit a felony under Illinois law.  725 ILCS 5/108A-4(b) (West 1992).  An application for an eavesdropping order need not prove beyond a reasonable doubt that a crime has been committed or even establish a 
prima
 
facie
 case; only a probability of criminal activity need be shown.  
People v. Ellis
, 122 Ill. App. 3d 900, 461 N.E.2d 646 (1984).  The issuing judge's finding or conclusion regarding the existence of reasonable cause for believing that the defendant was committing or had committed an offense and for believing that particular conversations concerning the offense would be obtained through eavesdropping are given great deference by courts.  
People v. Silver
, 151 Ill. App. 3d 156, 502 N.E.2d 1141 (1986).  In determining whether reasonable cause for such orders exists, courts use the "totality of the circumstances" test.  
Illinois v. Gates
, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983); 
People v. Hammer
, 128 Ill. App. 3d 735, 471 N.E.2d 615 (1984).

In the present case, Officer Carlson applied for the eavesdropping order after Rivas had already sold her a one-half kilogram of cocaine and had proposed another cocaine deal.  According to Rivas, Officer Carlson omitted material facts in the affidavit she submitted with her application for the order.  He contends that she should have detailed the entire course of her negotiations with Rivas in the affidavit.  However, an application for such an order should be viewed in a common sense manner.  
Ellis
, 122 Ill. App. 3d 900, 461 N.E.2d 646.  The affidavit included Rivas' name, any co-conspirators, the nature of the offense, the fact that Rivas had sold Officer Carlson the one-half kilogram of cocaine, Rivas' interest in another drug sale, and his promises to obtain more cocaine for her.  Therefore, the totality of the circumstances reveals that Officer Carlson's affidavit contained sufficient information to reasonable cause for the eavesdropping device.

In sum, we affirm Colon's and Rivas' convictions.  Our review of the record shows that a rational trier of fact could have found beyond a reasonable doubt that Colon knew that he was delivering cocaine to Rivas.  In addition, we find no error in the trial court admitting Officer Luna's statements about Colon's activities, or in admitting the pre-recorded funds sheet into evidence.  Also, the record reveals that a rational trier of fact could have found beyond a reasonable doubt that Rivas was not entrapped.  Finally, we find no trial court error in denying Rivas' motion to produce the confidential informant or in denying Rivas' motion to suppress the eavesdropping recordings.  In light of the foregoing, we affirm the judgment of the circuit court.

Affirmed.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.