**NOTICE**
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190003-U

NO. 4-19-0003

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

**FILED**
December 7, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JASON EVERETTE ANDREWS, | ) | No. 18CF158 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

_____

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding (1) the evidence was sufficient to
convict defendant of unlawful delivery of a controlled substance, (2) trial counsel
was not ineffective and did not labor under a *per se* conflict of interest, and (3) the
trial court did not deny defendant the opportunity to present evidence during the
hearing on his motion for a new trial.

¶ 2    Following an October 2018 bench trial, defendant, Jason Everette Andrews, was

convicted of one count of unlawful delivery of a controlled substance, a Class 2 felony (720

ILCS 570/407(d)(i) (West 2016)). Defendant appeals, arguing (1) the State failed to prove him

guilty beyond a reasonable doubt, (2) his trial counsel was ineffective, (3) his trial counsel

labored under a *per se* conflict of interest, and (4) the trial court erred when it failed to allow

defendant to present evidence during his posttrial motion for a new trial. We affirm the trial

court's judgment.

¶ 3                              I. BACKGROUND

¶ 4                              A. The Charges

¶ 5            On February 14, 2018, the State charged defendant by information with seven counts of unlawful delivery of a controlled substance. On February 21, 2018, a McLean County grand jury returned bills of indictment charging the same offenses. The charges stemmed from three controlled drug buys between defendant and a Bloomington Police Department (BPD) confidential informant, on December 12, 2017 (counts I and II), January 17, 2018 (count III), and February 13, 2018 (count VII). Prior to defendant's bench trial, the trial court allowed the State's motion to dismiss counts IV, V, and VI. As relevant to this appeal, count VII alleged defendant unlawfully delivered to Confidential Source (CS) 1219 less than one gram of a substance containing cocaine (720 ILCS 570/401(d)(i) (West 2016)).

¶ 6                              B. Bench Trial

¶ 7            In October 2018, defendant's case proceeded to a bench trial. As relevant to this appeal, the evidence presented at trial showed the following.

¶ 8                              1. *Evidence Presented at Trial*

¶ 9            Between December 2017 and April 2018, Detective Stephen Brown of the BPD Vice Unit conducted several "controlled buys" with the help of CS 1219, an individual named Henry Jenkins. On December 20, 2017, authorities arrested Jenkins after he acted as a "middle-man" for cocaine purchases. Jenkins avoided criminal charges being filed by agreeing to act as a confidential source for BPD. Jenkins also received financial compensation for his work as a confidential source.

¶ 10            After being searched by Lieutenant Bob Wall and within a few hours after his arrest, Jenkins entered into a CS agreement and called a contact to arrange another cocaine

purchase. Jenkins told detectives he called an individual named Jarrett Johnson for the purchase, who directed Jenkins to pick up the drugs from "the spot," an apartment building at 909 North Main Street. Detective Brown then drove Jenkins to the intersection of Main Street and Walnut Street in Bloomington, Illinois.

¶ 11　　　　Detective Brown coordinated with other detectives in the Vice Unit to establish surveillance of the apartment building at 909 North Main Street. Brown provided pre-recorded bills to Jenkins but did not search Jenkins again because Jenkins never left police custody after being searched by Lieutenant Wall. Jenkins walked from Detective Brown's car to the east entrance at 909 North Main Street, where a detective saw him meet briefly with a Black man in a hooded sweatshirt and then return to Brown's car. Jenkins provided Detective Brown with cocaine which Jenkins represented he had just purchased. Jenkins assisted Brown with a similar controlled drug purchase on January 17, 2018. This transaction was virtually identical to the first; however, no officers observed Jenkins's participation in the transaction because Jenkins left their line of sight when he entered the building.

¶ 12　　　　On February 13, 2018, Jenkins informed Detective Brown he had arranged another purchase, which would take place at Jenkins's apartment. Detective Brown set up a video recording device "designed to look like a coffee mug" on Jenkins's kitchen table. Detective Brown searched Jenkins's outer clothing and told him to stay in the kitchen area of the apartment to ensure he was on camera as much as possible. Detective Brown then searched the kitchen and a path leading from the kitchen to the front door. On cross-examination, Detective Brown admitted officers did not search the rest of the first floor or the bedrooms upstairs. Brown also admitted officers did not remain in the apartment with Jenkins, who had access to the entire apartment while he waited for defendant to arrive.

¶ 13        Detective Brown testified he photocopied $200 in cash, verified the serial numbers from the bills against those on the photocopies, and then gave Jenkins the prerecorded cash. Officers surveilled both entrances to Jenkins's apartment and the nearby streets. Jenkins waited alone in his apartment for approximately 73 minutes prior to defendant's arrival but was only positioned in front of the camera for approximately 71 seconds.

¶ 14        During Detective Brown's testimony, the trial court allowed the State's motion to admit People's Exhibit No. 4, a copy of the video recording of the February 13, 2018, controlled buy. After the court allowed the State's motion to publish People's Exhibit No. 4, the State played a 30-second portion of the video for the court. The 30-second portion of the video showed an individual with a build similar to defendant's, arriving at Jenkins's apartment. Although Jenkins let the individual in the apartment, no faces can be seen in the video. Once inside, Jenkins positions the two of them in front of the camera and hands some cash to defendant. Jenkins then shows defendant out of the apartment.

¶ 15        Additional footage from People's Exhibit No. 4, which the State failed to publish to the court, shows Jenkins exiting the camera view immediately after defendant leaves the apartment. Next, one can hear unidentifiable sounds in the background for approximately 25 seconds. Jenkins can then be heard calling the police to let them know the transaction was complete.

¶ 16        Detective Brown testified he returned to the apartment, where Jenkins gave him packages of cocaine. Brown again searched Jenkins and the kitchen and entryway of the apartment. Next, Detective Todd Walcott, who was assigned to the surveillance team, observed defendant exiting the apartment, and relayed defendant's description to the rest of the team. After receiving Detective Walcott's description, Sergeant Richard Beoletto observed defendant walk

northbound on Mason Street and enter the passenger's side of a white Nissan vehicle. Sergeant Beoletto testified he conducted a traffic stop of the vehicle, where he made contact with defendant. According to Beoletto, defendant attempted to flee before eventually being placed in handcuffs. Detective Jared Bierbaum testified that a search of defendant's person revealed $241 in cash; $200 of the cash matched the prerecorded bills Detective Brown gave Jenkins.

¶ 17        Henry Jenkins testified that he did not work and currently struggled with drugs, specifically, crack cocaine. Jenkins agreed he spoke with Detective Brown when he was arrested "in December of last year." Jenkins confirmed he purchased drugs for a detective in his role as a CS. Jenkins would typically call one person to arrange the purchase of drugs, but "someone else" would deliver them to him; he then identified defendant as the "someone else" from whom he purchased the drugs. Jenkins estimated he purchased drugs for BPD "three times."

¶ 18        Jenkins agreed the third buy he conducted for BPD occurred in January or February of 2018. According to Jenkins, police gave him $200, after which he "called the individual" and was told to wait in his apartment for a delivery. Jenkins testified that when defendant arrived, Jenkins let him in through the back door, gave defendant the officers' cash, and received four "packets." Jenkins confirmed he and his apartment were searched before and after the exchange.

¶ 19        On cross-examination, Jenkins admitted using crack cocaine almost every day for 30 to 35 years. Jenkins indicated he continued to use crack cocaine daily while working as a CS, but later stated that between December 2017 and February 2018, he was only using "one day a month." Jenkins denied ever keeping any portion of the drugs he purchased on behalf of the police.

¶ 20        Jenkins testified he would buy the drugs "[f]rom the source that [he] would call on the phone," but did not know this person's name. Jenkins described the person he would call as being a "tall skinny person with light skin," but did not know his age, when or how they met, or how he learned he could buy drugs from the person. Jenkins was not sure when he made purchases but stated that he "most likely" bought drugs more than once in January as he had been using drugs every day in January 2018. Jenkins denied dealing drugs, insisting he was a "middle man" and did not know anyone's real name.

¶ 21        Jenkins acknowledged a prior conviction for delivery of a controlled substance and recalled that defendant's trial counsel, Brian McEldowney, had been his defense attorney in that case:

> "[MR. MCELDOWNEY]: [Y]ou were convicted of delivery of a controlled substance on March 7th of 2016; do you recall that?
>
> A. March 7th of 2016?
>
> Q. That's right?
>
> A. I could have, sir. I don't—
>
> Q. You do have a conviction for delivery of a controlled substance, Class 2, that is true, in McLean County?
>
> A. Yes. Yeah, because you were my lawyer I think, yeah.
>
> Q. You're exactly right."

¶ 22        Jenkins identified Defendant's Exhibit No. 1 as a photograph of Jarrett Johnson, who he stated was the source he would call to arrange drug purchases. Jenkins first stated that Johnson "did not deliver nothing to [him]" but later agreed Johnson previously gave him drugs directly. Jenkins testified defendant had provided him with drugs on three occasions and

admitted he was providing testimony in hopes of receiving a favorable outcome on his pending charges. The State had not made any promises as to what would happen if Jenkins testified, and Jenkins had not asked any questions about what might happen.

¶ 23        Jenkins did not remember what specific date the third transaction in February 2018, took place but knew it had happened at his apartment. Jenkins recounted police patting him down and looking around his kitchen before the purchase but not searching the bedrooms upstairs or the majority of the living room downstairs.

¶ 24        Jenkins admitted he had a bad memory and did not ask anyone for names in case he was ever called to testify. Jenkins also acknowledged he was "real bad" with faces but could recognize a person if he bought drugs from them several times. Jenkins was "absolutely certain" defendant gave him drugs "on the three occasions we're talking about."

¶ 25        Joni Little testified she was a forensic scientist employed by the Illinois State Police. Little received three sealed containers of drugs from Detective Brown, maintained chain of custody, and confirmed each sample contained less than one gram of cocaine. Following the State's case-in-chief, defendant did not present any evidence.

¶ 26        During closing argument, defense counsel argued that Jenkins had "ample reason to fabricate, to lie, to falsely implicate [defendant] in this investigation both because he was being paid and because he had an incentive to work off these charges in hopes he wouldn't be prosecuted." He further argued that defendant's possession of the prerecorded bills "could be for any number of innocent reasons" and suggested that it was "very likely or possible that Jenkins owed him money, that [Jenkins] managed to lure [defendant] to that apartment with the express purpose of giving him that money to falsely implicate him in that crime." Defense counsel further emphasized the officers' search of Jenkins's apartment was "less than satisfactory" and

that "there was no shortage of opportunity for Henry Jenkins to have gone anywhere in the apartment during the period of time that officers were out of his view and to have obtained the drugs that he provided to the police that he could have secreted in his apartment."

¶ 27                              2. *Trial Court's Findings*

¶ 28            The trial court issued a written order with its findings on October 23, 2018. The court found that because Jenkins was the only direct witness of the December 20, 2017, and January 17, 2018, transactions, and Jenkins's testimony and credibility were "questionable," the evidence of those transactions was insufficient to prove defendant guilty beyond a reasonable doubt. Thus, the court found defendant not guilty of counts I, II, and III. However, the court found defendant guilty of count VII, citing the facts that (1) officers observed defendant leaving Jenkins's apartment on February 13, 2018; (2) defendant attempted to flee from the traffic stop with the prerecorded bills on his person; and (3) "Mr. Jenkins again placed an order for crack cocaine from Jarrett Johnson" before defendant arrived.

¶ 29                          C. Posttrial Motion and Sentencing

¶ 30            Defendant's trial counsel, Brian McEldowney, filed a motion for judgment notwithstanding the verdict or for a new trial on November 16, 2018, which alleged that the State had failed to prove defendant guilty of count VII beyond a reasonable doubt. On December 14, 2018, defendant *pro se* filed a handwritten pleading entitled "motion to set aside verdict, request for new trial, ineffective assistance of counsel." Defendant's motion alleged McEldowney failed to tell defendant about his prior representation of Jenkins, creating "an absolute conflict of interest" when McEldowney cross-examined Jenkins regarding a case in which McEldowney previously represented Jenkins. Defendant further alleged McEldowney provided ineffective assistance by failing to (1) disclose the conflict, (2) adequately meet and consult with him,

(3) file pretrial motions and challenge late-tendered discovery, and (4) conduct pretrial investigations.

¶ 31        On December 14, 2018, the trial court conducted a hearing on the posttrial motions. Defendant informed the court he wished to file two motions: one alleging ineffective assistance of counsel and another requesting the suppression of "illegally obtained video." The court then asked McEldowney whether he wished to adopt defendant's motions, and defendant stated, "I'm going *pro se*. *Pro se*. I don't want Mr. McEldowney anymore." The court explained that the allegation of ineffectiveness and the request to proceed *pro se* were different and that defendant would not have the benefit of an attorney if he fired Mr. McEldowney. The court then stated, "So what I'm trying to figure out at this point in time, are you asking to discharge Mr. McEldowney and go *pro se*, or do you wish to keep Mr. McEldowney in your case and raise *Krankel* issues about his deficient performance?" Defendant responded that he wished to proceed *pro se*, and the court, after questioning defendant regarding his capacity to proceed *pro se*, ultimately accepted defendant's waiver of counsel and discharged Mr. McEldowney.

¶ 32        Defendant argued McEldowney failed to provide effective assistance of counsel because McEldowney did not disclose his professional relationship with Jenkins and, had defendant known of this conflict, he would have requested conflict-free counsel. Defendant additionally alleged McEldowney refused to file a motion for a bill of particulars at his request, which defendant claimed would have prevented the State from presenting allegedly illegally obtained video at trial. Specifically, defendant alleged the overhear authorization for the video recording was unlawfully obtained. The trial court continued the hearing in order to review the overhear authorization.

¶ 33          The trial court reconvened the posttrial motions hearing on December 18, 2018. Defendant reiterated his claims of ineffective assistance of counsel as stated above. In response, McEldowney stated he believed there could be no conflict with respect to Jenkins because the two had no pending cases together by the time of defendant's trial, and therefore, he was not required to inform defendant about his relationship with Jenkins.

¶ 34          In response to defendant's motions to set aside the verdict and for a new trial, the State asserted that the overhear device had been properly authorized. After the trial court asked if defendant wished to present any further argument, defendant stated that McEldowney never informed him about the existence of the recordings before trial. At the conclusion of the hearing, the court denied defendant's motions for new trial, concluding (1) the overhear was properly authorized, (2) McEldowney provided effective assistance of counsel to defendant, (3) McEldowney did not labor under a *per se* conflict of interest, and (4) the evidence was sufficient to convict defendant of unlawful delivery beyond a reasonable doubt.

¶ 35          The trial court proceeded with the sentencing hearing on December 28, 2018, after reappointing McEldowney as counsel at defendant's request. However, defendant indicated again his preference to proceed *pro se*, which the trial court allowed. Following arguments, the court sentenced defendant to seven years in prison.

¶ 36          This appeal followed.

¶ 37                                  II. ANALYSIS

¶ 38          On appeal, defendant raises the following arguments: (1) the State failed to prove him guilty beyond a reasonable doubt, (2) his trial counsel was ineffective, (3) his trial counsel labored under a *per se* conflict of interest, and (4) the trial court deprived defendant of due

process when it denied him the opportunity to cross-examine his defense counsel or otherwise present evidence in support of his motion for a new trial. We affirm.

¶ 39                          A. Sufficiency of the Evidence

¶ 40        Defendant first argues Jenkins's testimony was so incredible that no rational factfinder could have found defendant guilty of unlawful delivery of a controlled substance beyond a reasonable doubt. We disagree.

¶ 41                          1. *Standard of Review*

"To support a conviction for delivery of a controlled substance, the State must establish that the defendant had: (1) knowledge of the presence of a controlled substance, (2) the controlled substance within his or her immediate control, and (3) the intent to deliver it. [Citation.] The element of knowledge can rarely be proven directly, and it is established by the defendant's actions, declarations or conduct from which the trier of fact may infer that the defendant knew of the existence of the controlled substance. [Citations.] Whether a defendant had knowledge of the controlled substance is a question of fact for the trier of fact. [Citation.] In criminal cases where the sufficiency of the evidence is at issue, the proper standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. [Citation.] The trier of fact is able to observe the witnesses' demeanor, determine their credibility [Citation.], and draw reasonable inferences from the evidence [Citation.]. Thus, a finding of knowledge by the trier of fact will not be set aside on review unless the evidence is so contrary to the verdict, or so unreasonable or

- 11 -

unsatisfactory that a reasonable doubt as to guilt exists. [Citation.]" *People v. Rivas*, 302 Ill. App. 3d 421, 429-30, 707 N.E.2d 159, 166-67 (1998).

¶ 42                                          2. *This Case*

¶ 43        Defendant argues the evidence was insufficient to convict him of unlawful delivery of a controlled substance because (1) Jenkins's testimony was not credible where he (i) admitted to using crack cocaine daily, (ii) could not remember names, dates, addresses, or the order in which the events in this case occurred, (iii) had prior convictions, and (iv) admitted he acted as a "middle man" in drug transactions; (2) the State's video evidence showed only the exchange of currency between defendant and Jenkins, but no controlled substances; (3) the police did not search several rooms in Jenkins's apartment prior to the controlled buy; and (4) Jenkins was left unsupervised and out of view of the camera for over an hour prior to the controlled buy.

¶ 44        Even acknowledging these weaknesses in the State's case, we conclude that— drawing all of the inferences from the facts in favor of the State—the evidence was sufficient to convict defendant of unlawful delivery of a controlled substance. First, although the video evidence did not show any exchange of drugs, defendant was observed entering the apartment and exiting approximately one minute later. Jenkins then provided Detective Brown with the "packets" he stated defendant delivered to him, which Joni Little testified tested positive for the presence of cocaine. Additionally, police officers recovered the prerecorded bills they had given to Jenkins from defendant's person in the search incident to his arrest. Moreover, defendant attempted to flee during the traffic stop leading to his arrest, which may be considered as evidence of defendant's consciousness of guilt. See, *e.g.*, *People v. Aljohani*, 2020 IL App (1st) 190692, ¶ 64 ("It is well established that flight, when considered with all the other evidence, is a

circumstance that a factfinder may consider as tending to prove guilt."). Even if Jenkins had the opportunity while off camera to access drugs that may have been hidden in the apartment, the court was not required to "accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229, 920 N.E.2d 233, 243 (2009). Furthermore, notwithstanding Jenkins's lack of credibility, the additional circumstantial evidence presented by the State was sufficient to corroborate Jenkins's testimony that defendant delivered cocaine to him in the February 2018 controlled buy. Accordingly, we find the State's evidence was sufficient to prove defendant guilty of unlawful delivery of a controlled substance beyond a reasonable doubt.

¶ 45                              B. Ineffective Assistance of Counsel

¶ 46        Defendant next argues his trial counsel, Brian McEldowney, was ineffective because he failed to publish the portion of the video evidence showing Jenkins's actions after defendant left his apartment and prior to Jenkins calling the police. Specifically, defendant argues McEldowney should have shown the portion of the video where unidentified sounds can be heard in the background for 25 seconds prior to Jenkins calling police and that those sounds "tended to show that Jenkins had ample opportunity to retrieve hidden drugs." We disagree.

¶ 47                              1. *Standard of Review*

¶ 48        To succeed on a claim of ineffective assistance of trial counsel, a defendant must satisfy the familiar two-pronged test the Supreme Court set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Patterson*, 217 Ill. 2d 407, 441, 841 N.E.2d 889, 908 (2005). "Under *Strickland*, a defendant must prove not only that defense counsel's performance fell below an objective standard of reasonableness, but also that this substandard performance caused prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would

- 13 -

have been different." *People v. Johnson*, 218 Ill. 2d 125, 143-44, 842 N.E.2d 714, 725 (2005).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome,

namely, that counsel's deficient performance rendered the result of the trial unreliable or the

proceeding fundamentally unfair." *People v. Enis*, 194 Ill. 2d 361, 376, 743 N.E.2d 1, 11 (2000).

" '[I]f the ineffective-assistance claim can be disposed of on the ground that the defendant did

not suffer prejudice, a court need not decide whether counsel's performance was constitutionally

deficient.' " *People v. Jackson*, 2018 IL App (3d) 170125, ¶ 24, 116 N.E.3d 996 (quoting *People

v. Griffin*, 178 Ill. 2d 65, 74, 687 N.E.2d 820, 828 (1997)).

¶ 49            "It is well settled that strategic choices made by defense counsel after a thorough

investigation of the law and facts relevant to the plausible options are 'virtually

unchallengeable.' " *People v. King*, 316 Ill. App. 3d 901, 913, 738 N.E.2d 556, 566 (2000)

(quoting *Strickland*, 466 U.S. at 690). "It is equally settled that trial counsel's decision whether

to present a particular witness is within the realm of strategic choices that are generally not

subject to attack on the grounds of ineffectiveness of counsel." *Id.* However, defense counsel's

strategic choices may render his assistance ineffective if they result in the failure to present

exculpatory evidence of which counsel is aware. *Id.*

¶ 50                                    2. *This Case*

¶ 51            Here, defendant has failed to show he was prejudiced by defense counsel's

decision not to publish the portion of the video recording showing Jenkins's actions after

defendant exited the apartment and before Jenkins called the police. First, although the State only

published to the court a 30-second portion of the video during trial, the trial court admitted the

entire video into evidence. In the court's written order containing its findings, the court stated it

had "considered the evidence" and referenced the video recording, noting that it "did not show

- 14 -

faces, but it did show a person consistent with defendant's build." We agree with the State that "the record does not establish that the trial court's consideration of the evidence overlooked the portions of People's [E]xhibit No. 4 that were admitted into evidence but not published by the prosecution during the bench trial."

¶ 52        Furthermore, defense counsel stated during closing argument that the exchange of money shown in the video recording could merely have been Jenkins repaying defendant a debt he owed. Defense counsel also emphasized multiple times during his cross-examinations of Detective Brown and Jenkins that the police did not thoroughly search Jenkins's entire apartment and that Jenkins was left alone for over an hour prior to the transaction with defendant, giving him ample opportunity to potentially retrieve hidden drugs in his apartment. Although defense counsel did not specifically argue that the unidentified sound in the video recording after the transaction took place was, in fact, the sound of Jenkins retrieving hidden drugs from his apartment in order to set up defendant, defense counsel thoroughly argued Jenkins had the opportunity and motivation to have done so. Ultimately, the court had the opportunity to review this portion of the video recording and determined that in spite of Jenkins's general lack of credibility, the additional circumstantial evidence presented by the State rendered its theory of the case more credible than defendant's. Accordingly, we conclude there is no reasonable possibility that the outcome of defendant's case would have been different had counsel published this portion of the video recording during defendant's bench trial, and we need not address whether counsel's performance was deficient.

¶ 53               C. Defense Counsel's Alleged *Per se* Conflict of Interest

¶ 54        Defendant next argues McEldowney labored under a *per se* conflict of interest due to his prior representation of Henry Jenkins. We disagree.

- 15 -

¶ 55                                    1. *Per se Conflicts of Interest*

¶ 56            "The right to effective assistance of counsel under the sixth amendment to the

Constitution of the United States entitles a criminal defendant to the undivided loyalty of

counsel, free from conflicting interests or inconsistent obligations." *People v. Enoch*, 146 Ill. 2d

44, 51-52, 585 N.E.2d 115, 119 (1991). "A criminal defendant's sixth amendment right to the

effective assistance of counsel includes the right to conflict-free representation." *People v.*

*Peterson*, 2017 IL 120331, ¶ 102, 106 N.E.3d 944.

¶ 57            "Two categories of conflict of interest exist: *per se* and actual." *Id.* A *per se*

conflict of interest may be found "(1) where defense counsel has a prior or contemporaneous

association with the victim, the prosecution, or an entity assisting the prosecution; (2) where

defense counsel contemporaneously represents a prosecution witness; and (3) where defense

counsel was a former prosecutor who had been personally involved with the prosecution of

defendant." *People v. Fields*, 2012 IL 112438, ¶ 18, 980 N.E.2d 35. "Under this rule, the

defendant's conviction must be reversed if (1) defense counsel has an actual or potential conflict

of interest stemming from a previous or current commitment to a party with interests adverse to

the defendant, and (2) the defendant does not waive the conflict." *People v. Graham*, 206 Ill. 2d

465, 472, 795 N.E.2d 231, 236 (2003). The Illinois Supreme Court has held that "in cases where

defense counsel has represented a State's witness, a *per se* conflict of interest will not be held to

exist unless the professional relationship between the attorney and the witness is

contemporaneous with defense counsel's representation of the defendant." *Fields*, 2012 IL

112438, ¶ 20.

¶ 58                                    2. *This Case*

¶ 59     Here, defendant argues that McEldowney's *per se* conflict of interest arose under two theories: (1) he had a prior association with Jenkins as "an entity assisting the prosecution" and (2) he contemporaneously represented Jenkins as a prosecution witness. Defendant's argument fails under both theories.

¶ 60     First, the Illinois Supreme Court has definitively held that "an entity *does not include a person* for purposes of *per se* conflicts of interest." (Emphasis added.) *Fields*, 2012 IL 112438, ¶ 33. Jenkins, as a person, does not meet the definition of an entity. Accordingly, defendant's claim of a *per se* conflict under this theory necessarily fails as a matter of law.

¶ 61     Next, relying on *People v. Daly*, 341 Ill. App. 3d 372, 792 N.E.2d 446 (2003), defendant argues McEldowney labored under a *per se* conflict because he was required to cross-examine Jenkins, his former client and a prosecution witness, "about a matter in which counsel had represented Jenkins." In *Daly*, the defendant's attorney, Endres, previously represented the State's chief witness, confidential informant Jockisch, on charges that were dismissed when Jockisch agreed to become a confidential informant in undercover controlled drug buys. *Id.* at 373. Several of these controlled drug buys involved sales between Jockisch and the defendant, Daly. *Id.* at 374. At Daly's trial, "Endres, to properly represent Daly, needed to cross-examine Jockisch about matters that arose during the very time Endres was representing Jockisch—specifically, the charges against Jockisch, the dismissal of those charges, and any agreement or arrangement Jockisch made with law-enforcement authorities to achieve dismissal." *Id.* at 377. Under these circumstances, this court determined that "to the extent that, in any subsequent case, Endres would ever be called upon to cross-examine Jockisch about matters occurring during the time Endres represented Jockisch," Endres's professional relationship with Jockisch "continue[d] indefinitely." In other words, Endres's representation of

Jockisch constituted a *per se* conflict because it was "contemporaneous" with his representation of Daly. *Id.*

¶ 62　　　We find the circumstances in this case distinguishable from those presented in *Daly* where there is no evidence McEldowney's representation of Jenkins was contemporaneous with his representation of defendant. During defendant's bench trial, McEldowney impeached Jenkins regarding his conviction for unlawful delivery of a controlled substance in March 2016, a case in which McEldowney represented him. Jenkins testified that he was arrested again in December 2017, leading to him becoming a confidential informant in this case. Unlike in *Daly*, McEldowney was not required, in order to effectively represent defendant, to cross-examine Jenkins regarding the details of his March 2016 conviction because there is no evidence the conviction was in any way related to his eventual work—over a year later—as a confidential informant in the present case. Thus, there is no basis to view McEldowney's representation of Jenkins as having "continu[ed] indefinitely," as was the case with Endres's representation of Jockisch in *Daly*. See *id.* Additionally, McEldowney stated at the posttrial motions hearing that his representation of Jenkins concluded prior to his appointment as defendant's counsel in this case. We conclude McEldowney did not labor under a *per se* conflict of interest because his representation of defendant was not contemporaneous with his representation of Jenkins. See *Fields*, 2012 IL 112438, ¶ 20.

¶ 63　　　D. Presentation of Evidence in Support of Defendant's Posttrial Motion

¶ 64　　　Finally, defendant argues the trial court deprived defendant of his constitutional right to due process when it denied him the opportunity to call his trial counsel to testify or present other evidence at the hearing on his motion for a new trial. We disagree.

¶ 65    Citing *People v. Dixon*, 366 Ill. App. 3d 848, 853 N.E.2d 1235 (2006), defendant argues that after accepting defendant's waiver of counsel and request to proceed *pro se*, the trial court should have allowed defendant "sufficient time to file additional motions, gather evidence, and prepare arguments." In *Dixon*, the trial court allowed the defendant to proceed *pro se* for his posttrial proceedings after the trial court determined, following a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984), that there was no basis to appoint new counsel to investigate the defendant's *pro se* claims of ineffective assistance of his trial counsel. *Id.* at 850. After the inquiry, the trial court continued the proceedings to allow defendant to prepare for a hearing on the defendant's *pro se* motion for a new trial. *Id.* at 853. At that hearing, the trial court allowed the defendant to cross-examine his defense counsel, but the defendant ultimately stopped his cross-examination to request that he be allowed to bring in family members to testify regarding his ineffective assistance claims. *Id.* at 854. The trial court denied the defendant's request for further witnesses and denied his motion for a new trial. *Id.* On appeal, the First District rejected the defendant's argument that he was denied due process on the ground he was not allowed to present evidence during the hearing on his motion for new trial, concluding the defendant had ample opportunity to prepare for the hearing and failed to request the opportunity to present witnesses in advance. *Id.* at 854-55.

¶ 66    We find defendant's reliance on *Dixon* to be inapposite here. First, the *Dixon* court's holding merely concluded that the level of due process afforded to that defendant was sufficient; it did not state that anything less than what he received necessarily constituted a deprivation of due process. *See id.* While the trial court in *Dixon* allowed the *pro se* defendant additional time to prepare for arguments on his motion for a new trial, defendant in this case specifically stated, during his posttrial motions hearing and after his request to proceed *pro se*,

that he was prepared to proceed on his *pro se* motion for a new trial. Defendant never suggested he wanted to continue the proceedings or that he needed additional time. Moreover, we agree with the State that the trial court did not deprive defendant of the opportunity to present evidence in support of his motion because there is nothing in the record indicating defendant desired to present such evidence. After the initial hearing on December 14, 2018, was continued to December 18, 2018, the trial court again allowed defendant to argue his motion. The court asked defendant several times whether he had "anything else" to present and allowed defendant to make further arguments following the State's response to his motion. Unlike in *Dixon*, defendant never asked to present additional evidence and therefore cannot argue the trial court denied him of that opportunity. See also *In re Commitment of Williams*, 2020 IL App (3d) 180588, ¶ 17, 148 N.E.3d 913 (rejecting the respondent's argument that he was barred from presenting evidence on his behalf at commitment hearing where the respondent never tendered a witness to testify). Accordingly, we conclude defendant was not deprived of due process.

¶ 67                        III. CONCLUSION

¶ 68        For the reasons stated, consistent with Illinois Supreme Court Rule 23(b) (eff. Apr. 1, 2018), we affirm the trial court's judgment.

¶ 69        Affirmed.